## GLENN NICHOLS LAND CO. et al. v. PRINCE. (No. 8412.)

(Court of Civil Appeals of Texas. Galveston. Feb. 2, 1924. Rehearing Denied May 15, 1924.)

**1. Brokers ☞53—Pleading and proof that efforts in interesting purchaser resulted in sale held sufficient to authorize recovery of share of commissions.**

To recover agreed share of commissions received by defendant brokers for selling property as result of plaintiff broker's efforts in procuring purchaser, pleading and proof that his efforts in interesting prospective purchaser resulted in sale is sufficient; plaintiff not being held to strict requirement of ordinary broker dealing with owner that he be procuring cause of completed sale individually.

**2. Brokers ☞88(2)—Whether broker was entitled to share of profits for mere efforts in procuring purchasers held for jury.**

Whether brokers, sued for share of commissions received by them for selling oil leases, agreed that plaintiff broker should receive half the profits or proceeds of sales resulting from plaintiff's efforts in procuring purchasers, or whether contract required plaintiff to find purchaser and actually agree on sale, held for jury, whose findings for plaintiff entitled him to recover, if kind of service required was performed and resulted in mutually contemplated advantage to his associates.

**3. Brokers ☞86(4)—Findings that broker interested purchaser and that sale was result of his efforts held supported by evidence.**

In broker's action for share of commissions and profits from sale of oil leases by defendant brokers, jury's findings that plaintiff's efforts caused purchaser to become interested, and that sale was result of such efforts, held supported by evidence.

**4. Brokers ☞85(1)—Evidence that broker had been on land with defendant and prospective purchasers of oil leases held admissible to rebut testimony that he was only authorized to sell city property.**

In broker's action for share of commissions and profits from sale of oil leases by defendant brokers as result of plaintiff's efforts in interesting purchaser, admission of testimony that plaintiff had been on land with defendant, owner, and prospective purchasers, and bored thereon in effort to locate salt dome, held admissible to rebut testimony that he was only authorized, by contract with defendants, to sell city property.

**5. Judgment ☞204—Judgment for value of stock, if not delivered to plaintiff by defendants, held not error.**

In broker's action for share of profits from sale of oil leases by defendant brokers to purchaser interested by plaintiff, judgment for value of stock received in part payment, if stock itself was not delivered to plaintiff, held not error, where defendants admitted possession of stock, and failed to challenge correctness of court's finding, on sufficient evidence, as to value thereof.

**6. Appeal and error ☞722(1)—Character of motion for new trial held not destroyed by use as motion to set aside jury's findings and filing of second motion for new trial.**

That motion for new trial, from which assignments of error were taken, also served as motion to set aside jury's findings, and that second motion for new trial was later filed, did not affect character of first motion.

**7. Appeal and error ☞748(1) — Complaint against assignment as too general not sustained, where same points are elsewhere properly raised.**

Proper complaint against assignment of error and attendant propositions as too general need not be sustained, where same points are elsewhere properly raised.

Pleasants, C. J., dissenting.

Appeal from District Court, Harris County; W. E. Monteeth, Judge.

Suit by George Prince against the Glenn Nichols Land Company and others. Judgment for plaintiff, and defendants appeal. Affirmed.

J. V. Meek, H. E. Kahn, and Maurice Hirsch & Allen Hannay, all of Houston, for appellants.

Ball, Merrill & Ball, of Houston, for appellee.

GRAVES, J. The nature and result of this suit is correctly reflected, we think, in this statement from appellee's brief.

"Appellee sued appellants, a firm of real estate dealers and brokers, composed of C. Glenn Nichols and E. A. Meyer, for breach of contract, alleging that he had a contract with appellants, by the terms of which he was to devote all of his time and attention to the busi-

ness of securing prospects for and selling lands, town lots, and leases owned by or listed with appellants for sale, and was to pay his own expenses incident to such employment, including the use of his automobile; that he was to receive as compensation for his services 50 per cent. of all commissions received by appellants on properties sold on commission, and 50 per cent. of all profits made on properties handled by appellants, where the sales were made by him or were the result of his efforts in procuring a purchaser.

"He further alleged that during April, 1921, and while this contract was in force, he procured as a prospective purchaser of oil leases one Thos. L. Hisgen, of Springfield, Mass., whom he introduced to appellants as such prospective purchaser, and that as a result of his efforts, combined with those of appellants, the said Thos. L. Hisgen became the purchaser of certain oil leases from the appellant E. A. Meyer, and that as the result of such transaction appellants received as their profits on the deal $10,000 in cash and $25,000 in the capital stock of the Hisgen Texas Petroleum Company, a corporation, and that appellants had paid him only the sum of $250 in cash and $2,500 in corporate stock, leaving due him as his compensation $4,750 in cash and $10,000 of the capital stock of the corporation, which appellants had failed and refused to pay him.

"Appellants pleaded, besides their general denial, the following special pleas: (a) That under appellee's contract he was not authorized to handle oil leases or lands, but was confined to city property; (b) that under appellee's contract he was not entitled to any compensation, except on trades actually closed by him in person; (c) that at the time he came in contact with Thos. L. Hisgen and brought him to the office of appellants the said Hisgen was not a prospective purchaser of oil lands or leases, but was looking for a driller to complete a well at Friendswood; (d) that at the time appellee brought said Hisgen to the office of appellants and introduced him, the oil leases subsequently sold to said Hisgen were not owned by appellants or listed with them for sale; (e) that appellee never mentioned the two leases subsequently sold to Hisgen in any conversation he had with said Hisgen.

"The case was tried before a jury, which returned a verdict in the form of answers to special issues, establishing the following facts: (1) That under appellee's contract with appellants he was to receive 50 per cent. of the profits or proceeds accruing or to accrue to appellants on the sale of lands and oil leases as the result of his efforts or services; (2) that under said contract it was not necessary for appellee to find a purchaser and actually agree upon a sale in order to entitle him to his commission on the transaction; (3) that the efforts of appellee caused Thos. L. Hisgen to become interested in the acquisition of the two leases in question; (4) that the sale of the two leases in question was the result of the services or efforts of appellee; (5) that Hisgen became interested in buying the leases in question in February, 1921; (6) that at the time appellee met Hisgen and introduced him to appellants said Hisgen was looking for or interested in leases in oil fields of South Texas,

for the purpose of purchasing same; and (7) that the said Hisgen, at the time appellee met him, was in the city of Houston for the purpose of finding an oil driller for the purpose of deepening a well at Friendswood.

"The trial court rendered judgment on the verdict of the jury and upon his independent findings of fact in favor of appellee for the sum of $4,750, with interest from the 26th day of October, 1921, and also rendered judgment in favor of appellee for the $10,000 capital stock of the Hisgen Texas Petroleum Company, then in the possession of appellants; and in the alternative, if said corporate stock was not delivered, then for $10,000 as the value of said capital stock."

Appellants assail the judgment so rendered, presenting in this court 39 assignments of error, contending in the main that under the contract as pleaded the evidence was insufficient to support a recovery; that the cause should not have been submitted to the jury; that much testimony was wrongfully received over their objections; that their motion for peremptory instructions in their favor should have been granted; and that the fixing of $10,000 as the value of the stock rested upon no evidence as to any market value at all.

We shall not undertake to separately or in detail discuss the great number of propositions through which these several matters are pressed, but only such controlling issues as, in our opinion, determine the merits of the appeal.

[1] Perhaps the leading position taken is that the appellee did not show himself to have been the procuring cause of the sale within the terms of the contract of service he declared upon; as a corollary it is then said the issues which elicited the above-copied findings on that question were improperly submitted to the jury. We think a complete answer to this contention lies in a correct appraisement of the nature and effect of the agreement he pleaded and a proper application thereto of his supporting proof.

The contract sued upon was by no means the usual one employed between an owner on the one hand and a real estate agent or broker on the other, whereby the latter agrees to compensate the former for becoming the procuring cause of a sale of his property at the price and on the terms fixed between them; these parties were all agents and brokers, and this agreement was inter sese as such, having relation to the division between and among themselves of either the profits or the proceeds resulting to appellants from the efforts or services of the appellee in connection with their joint enterprise; he could not therefore be held down to the strict requirement necessary for an ordinary broker to recover from the owner, that is, that he individually be the procuring cause of a completed sale, as that term

is applied in that class of transactions; it is enough here, we think, that he both pleaded and proved that his efforts and service in interesting for appellants (and in that sense procuring) a prospective purchaser led to and resulted in the sale; that this much was done seems clear under the record at bar.

[2] In paragraph 2 of his trial petition, after setting out the character of appellants' business as being that of agents in handling lands and leases, together with the fact of his own prior connection with them for approximately one year, he alleged the substance of his engagement with them as follows:

"Plaintiff had been associated with defendants in said real estate business under an arrangement whereby plaintiff devoted all of his time to the business of procuring purchasers for lands and leases which were controlled by or listed with defendants, or which said defendants desired to handle for themselves or the owners thereof; that in consideration of his services in procuring purchasers or prospective purchasers for said lands, leases, or royalties it was agreed and understood by and between plaintiff and defendants that plaintiff should have and receive one-half of the profit or proceeds accruing or to accrue to defendants as a result of the efforts or services of plaintiff, and that such arrangement was respected, observed, and carried out in each and every instance in which a sale or lease was made to any person or persons with whom plaintiff negotiated in connection with the sale of such property, with the exception of the matter herein complained of."

Then follow averments which are fairly summarized in the introductory statement.

In support of this pleading as to the character and terms of his contract the appellee testified in part:

"I had under my charge then the general leasing of all the leases that Glenn Nichols Land Company had in charge or was listed in their line. That was turned over to me to sell; Goose creek. * * *

"Mr. Nichols told me to take the Goose creek property and get out and hot foot and sell that lease. That was the Busch lease; the Goose creek property. * * *

"I was to receive 50 per cent. of all sales that I made and 50 per cent. of the profits and commissions of the sales that I made or was the means of bringing in the office, or the office made it, or I made it, I was to get 50 per cent. of the commission or profit that I was instigator in bringing there or the means. Mr. Frazer and Mr. Meyer and myself made those arrangements. At the time I made this arrangement I was not to receive any salary from them. It was only a strict commission basis; 50 per cent. commission. I was to finance myself and pay my own expenses, car and everything. At that time I did not have a car, but the agreement was that I was to furnish my own car before I took the job. Immediately afterwards I got the car, at my own expense, absolutely. I maintained the car in so far as the grease and such as that for it."

Of not different import is the version of Sam Frazer, the member of appellants' force who, with Mr. Meyer's knowledge and approval of the terms of the contract, employed appellee for them. He testified:

"I explained to him that the principal thing then was city property, but I said, 'This firm handles oil leases and lands,' and I said, 'Anything comes up you will be given a chance at that,' and that was subsequently borne out by the fact that Mr. Meyer did take Mr. Prince out of the city department and put him in the lease department, selling Blue Ridge. He was to get out and dig up buyers for the property, purchasers for them, for the 50 per cent. that he was to receive. * * * My understanding was that any deal that a salesman was instrumental in bringing to the office would entitle him to it. * * * It was his business to show property and to interest buyers in property, and that we would be glad to help him out in any way we could. * * *"

Appellants answered these declarations by both pleading and testimony to the effect that appellee was not authorized to sell anything but city property, and was to get no commission except on sales actually consummated by him.

Two directly opposing theories as to the real relationship between the contesting litigants were thus presented, and the trial court submitted them for fact findings to the jury in these two special issues:

"No. 1. When plaintiff was associated with the business of defendants, did or did not they enter into an agreement by the terms of which plaintiff was to devote all of his time to the business of procuring purchasers or prospective purchasers for lands and leases controlled by or listed with defendants or which defendants desired to handle for themselves or the owners thereof, with agreement whereby plaintiff should receive for his services one-half of the profits or proceeds accruing or to accrue to defendants as the result of the efforts or services of plaintiff? Answer 'They did' or 'They did not,' as you find the facts to be.

"No. 2. Under plaintiff's engagement with the defendant, was it their contract that the plaintiff would have to find a purchaser and actually agree upon a sale with him to entitle him to a commission on the transaction? Answer 'It was' or 'It was not,' as you find the fact to be."

The jury answered No. 1, "They did," and No. 2, "It was not."

As the pleadings and evidence referred to, while not all the record reflects upon the same subject, were alone sufficient to raise these questions and make of them proper matters for determination by a jury, their settlement in appellee's favor closed that branch of the case, and entitled him to recover, under what has been said, provided the kind of service he was thus to render was performed and resulted in the advantage to his associates it was so mutually understood it should.

[3] This feature also was the subject of a sharp conflict, with like result; the subject-matter of the controversy in suit was the sale by appellants through conveyances from Mr. Meyer, who held the title for their joint benefit, of two oil leases at Goose creek, known as the Busch and Scarrego leases, to Mr. Thos. L. Hisgen of Springfield, Mass., for himself and for a corporation thereafter organized by him for that purpose, to wit, the Hisgen Texas Petroleum Company, of Maine, to which the property subsequently passed; out of this sale the undisputed evidence showed appellants got $10,000 in cash and $25,000 of the corporation's stock. The part taken by appellee in and its resulting effect upon this sale went to the jury under these two questions:

"No. 3. Did or did not efforts on the part of plaintiff cause the said Thomas L. Hisgen to become interested in the acquisition of the two leases offered in evidence for himself or the Hisgen Texas Petroleum Company that were assigned to the Hisgen Texas Petroleum Company by E. A. Meyer, in the Goose creek field? Answer 'They did' or 'They did not,' as you find the facts to be.

"No. 4. Was or was not the sale of the two leases in question to the said Thomas L. Hisgen, which were afterwards assigned to the Hisgen Petroleum Company by E. A. Meyer, the result of the services or efforts of plaintiff? Answer 'It was' or 'It was not,' as you find the fact to be."

No. 3 was answered, "They did," and No. 4, "It was."

As our preliminary statement has before recited, there were further inquiries and answers to the effect that Mr. Hisgen became interested in buying these two leases in February, 1921; that when he met appellee in appellants' office in Houston he was both looking for or interested in leases in the South Texas oil fields for the purpose of purchasing, and was there looking for a driller to deepen an oil well at Friendswood, Tex.

Appellants, with much earnestness, attack all these findings as being contrary to the evidence, ably contending for these particular matters, among others, as being conclusive counter considerations:

(1) That appellee met and introduced Mr. Hisgen to appellants in Houston in February of 1921, not in April, as he alleged; that he never then nor at any other time discussed the leases here involved with him; that Mr. Hisgen was not at that time interested in the purchase of oil lands at all, but as the employee of its owners was merely looking for a driller for the Friendswood well, and did not become so interested in these leases until about two months later, that is, April 15, 1921, when he became so only through direct relations between him and appellant Nichols.

(2) That at the time appellee so first met and introduced Mr. Hisgen to them appellants neither owned, controlled, nor had any connection with these leases, and were accordingly in no position to offer them for sale to a prospective purchaser.

(3) That the sale was not in fact to Mr. Hisgen but to the Hisgen Texas Petroleum Company, a Maine corporation, to which appellant Meyer conveyed the leases in May, 1921, and it was not in existence at the time appellee claimed to have rendered the service on account of which he sued.

After careful study of the statement of facts, we are unable to agree that the evidence so shows, concluding rather—and so finding—that there was sufficient support for the jury's verdict. The undisputed evidence showed that appellee met Mr. Hisgen in Houston during February and not in April, as his pleading put the date, a discrepancy which we think amounted to nothing, under other substantive facts and circumstances appearing; that he did meet and discuss with him the desirability and probable advantage of becoming interested as a prospective purchaser of oil lands and leases through appellants, whom he highly recommended as being the proper men to deal with in such business, substantially as he averred, stands in the record undisputed, both the appellee and Mr. Hisgen himself so testifying.

It was further shown without dispute that at that particular time these leases, or at least the larger one, were listed for handling and sale by them in the offices of appellants where the appellee had his desk, and out of which he worked for them, appellee swearing in that connection that some time previously, at appellants' request, he had made a map of these two leases put into the office of Hans Baker and the Scarrego people, showing them closer up to a gusher down there, and that Mr. Nichols had then told him to get out and find a buyer for the Scarrego tract also; that this was before his first meeting with Mr. Hisgen, and he had shown these properties to other prospective purchasers, Mr. Nichols volunteering to and going along, after notifying Hans Baker, who controlled the Busch tract, to also be therewith hand drills and negroes for surface boring.

Testifying directly as to what he did with Mr. Hisgen, he further said in substance: That these maps he had so made of this property were used in the negotiations with Mr. Hisgen, who had taken one of them back to Massachusetts with him after his first meeting in Houston with appellee; that this meeting had occurred on the sidewalk in front of appellants' office, when he took Mr. Hisgen for a prospect, introduced himself, and asked if he was looking for farm lands, or property of any kind; on being advised that he was not looking for farm lands, but had been upstairs hunting for a driller, and, being asked if he knew the people, appellee says this ensued:

"I said, 'I haven't the remotest idea who they are, but, if you are looking for a proposition in oil or oil lands or farm lands or anything in the oil lands,' I said, 'You don't have to go any further, here is the place you want to go; land right here; because Mr. Nichols is one of the best in the business, and we handle all kinds of properties and everything of that description, and we will take care of you.' And I invited him in, set his grip down, and got him in the office in that way. I did not go off and leave him. I stayed right with him. I stayed with him from about half past 7 until about 10 o'clock before Mr. Nichols or Mr. Meyer came. I went over with him the general conditions of the Gulf Coast fields here, and told him all about our wells, and so forth. I had a book of photographs which I showed him, the fields and the gushers here, and he said that he was here to look for drillers to open up the Friendswood well. I said, 'Mr. Hisgen, you are on a dead proposition, because Mr. Nichols has just finished drilling at League City, and it is absolutely a dry proposition all the way through there, and you are losing time on that. Why don't you get some property that will do you some good, get in a proven field, of which we have acreage in every Gulf Coast field in Texas, barring none, and Mr. Nichols is the man that can take you there and show it to you, because he is an oil expert, and knows every inch of this Gulf Coast country. I showed him several blueprints that we had there, entertained him properly and generally, and told him that Mr. Nichols would be down very soon."

He continued as to what occurred after Mr. Nichols came in as follows:

"I said, 'Mr. Nichols, this is Mr. Hisgen from Springfield, Mass., down here on an oil proposition;' I said, 'Mr. Hisgen, this is the man I have been telling you about.' So Mr. Nichols took me to the back office, and he said, 'Have you said anything or made any prices with reference to oil leases and so forth;' and I said, 'I have not said anything that will conflict with anything you will tell him. I have held him here and gone over the thing in a general line.' So Mr. Nichols said, 'Well, you leave him to me, don't have anything else to do with him, you leave him to me.' Mr. Meyer stepped in about that time. I said, 'Mr. Meyer, I want to introduce you to Mr. Thomas L. Hisgen of Springfield, Mass.,' and I left him with Mr. Nichols, who had told me he would take care of him in every particular. I said, 'Gentlemen, I will leave you together.'"

After adding that Messrs. Nichols and Hisgen went down to Friendswood the same day, and that he himself waited around the office until they returned, he concludes with the statement that Mr. Nichols then said to him:

"Well, he will never open that Friendswood well. George, now I want you to stay away from Mr. Hisgen, and I don't want you to talk to him. I don't want anybody around this office to meet Mr. Hisgen or talk to him except Mr. Meyer and myself,' he said, 'because anything you will say will conflict with what I have already gone through.' I said, 'All right,

I will follow your instructions.' So I left him strictly and entirely alone."

Mr. Hisgen, after saying he had been in the oil business for 30 years when he bought these leases, that he first came on his own initiative to Texas in December, 1920, when he made no investments, but came again in February, 1921, in the interest of the Friendswood Company when he "first became interested and made an investment," further testified:

"At the time that I went back to make my report on the Friendswood well to my associates up there, I had a blueprint from Mr. Nichols in regard to the Goose creek property, but I had not gone out there to see it. I merely had the blueprint, which I took back to Springfield. That was the Scarrego lease. That is one of the leases we are drilling on at present."

As to what occurred at their first meeting in appellants' office while appellee was holding him until Mr. Nichols arrived, after first saying he did not remember, he later admitted that appellee told him practically what has been quoted from the former's testimony.

He further testified that, on coming back to Houston in April he went directly to Mr. Nichols' office, having in mind the Goose creek property and the Blue Ridge proposition; that on this first return visit Mr. Nichols gave him the Scarrego 54-acre tract, the price, and everything of the kind, taking him right away down to see both leases; that during the same month, that is, on April 26, 1921, he bought an option on the two tracts, agreeing to pay the $10,000 cash and 25,000 shares of company stock, went back to Massachusetts with this option, organized his company, and later closed the transaction, paying the consideration; that while the option was taken in his indivdual name for the benefit of himself and the corporation, the leases themselves were subsequently assigned to it.

He acknowledged that appellee put him in touch with appellants, saying on that point:

"It was only through Mr. Prince that I got acquainted with Mr. Nichols and Mr. Meyer both."

It otherwise appeared that, on April 15, 1921, appellants had submitted to Mr. Hisgen a written proposition touching the sale of the two leases in question; that the contracts for the leases from the owners really belonged to the firm, but that Mr. Meyer for them both did not get formal transfers thereof to himself until April 26th, which was the same day he sold them under the option to Mr. Hisgen; Hans Baker testified in this connection that, before conveying the Busch tract to Mr. Meyer, he had an understanding with Mr. Nichols that it would not be leas-

ed to any one without the money to develop it; that he knew Mr. Hisgen was to have it, and had been satisfied as to his financial responsibility.

Under this evidence, together with much other of the same trend that might be cited, the jury would not have been without warrant in concluding that appellants either had, or assumed to appellee to have in first turning the property over to him to sell, such control over it as authorized them to offer it for sale some months prior to the formal leases made to Mr. Meyer; that appellee first procured and interested Mr. Hisgen in this property as a prospective purchaser, and did nothing further toward the consummation of the sale because of the direct intervention to that end of appellants themselves; and that the taking of the leases in the name of Mr. Meyer only, as well as the ultimate assignment thereof by him direct to the corporation after making the contract of sale with Mr. Hisgen individually, were but methods of carrying out a transaction which came squarely within the terms of the appellee's contract and service.

If appellants took appellee's customer—found interested as a prospective purchaser, and so introduced by him—and thereafter carried on all the negotiations with him direct, under express prohibition to appellee to have anything more to do with him, their subsequent successful efforts in completing a sale would inure, under such a contract as here existed and to the extent of its provisions, to and should be held to be for appellee's benefit. That Mr. Hisgen, before ending his February visit to Houston, not only became so interested but also had had some communication or understanding with appellants about this property, appears from the fact that he then took back north with him a blueprint of the Scarrego lease and a proposition from Mr. Nichols with reference to it.

[4] Under all the facts and circumstances we cannot hold the verdict unjustified. Neither do we think there was prejudicial error, as against the objection that it was irrelevant and immaterial, in the admission of the testimony showing that appellee had been on the land here involved as early as January, 1921, with appellant Nichols, Hans Baker, one of its owners, and two representatives of oil companies as prospective purchasers, and boring thereon with hand drills in the effort to locate a salt dome; as before indicated, there was a direct conflict in both pleadings and testimony from the opposing litigants as to whether in February thereafter appellee had any authority to deal with oil lands or other than city property, and in receiving this evidence the court confined it to "the purpose of rebutting testimony introduced by defendants to the effect that plaintiff was only authorized in his contract of employment with defendants to sell city property." It was clearly admissible for that purpose.

[5] The complaint for error in that portion of the judgment awarding a $10,000 recovery as the value of the stock cannot be sustained; this provision of the decree was only an alternative one, dependent on the failure of appellants to produce the stock itself, which was admittedly shown to be in their possession at the time; they were therefore in position to satisfy the judgment by delivering the stock. Furthermore, the court itself, on sufficient evidence, found the stock to be worth that much, and appellants have in no proper procedural maner challenged the correctness of that determination.

On the cause as a whole we conclude that the inquiries submitted to the jury presented the issues raised by the pleadings and developed facts; that the findings of both jury and court were sufficiently supported by proof; and that no reversible error was committed in the receipt or rejection of testimony.

[6] The objections of appellee to certain assignments of appellants have been duly considered; that to assignments 36 to 39, inclusive, is not thought to be sound; the motion in the trial court from which these are taken was filed as and prayed for a new trial; the fact that it also served as a motion to set aside the findings of the jury and that a second motion for a new trial was later filed did not make the first one any the less so.

[7] The complaint against assignment No. 20 and its attendant propositions as being too general to merit consideration is well taken, but, since the same points are elsewhere properly raised, it would get nowhere to sustain it.

The judgment has been affirmed, with Chief Justice Pleasants dissenting.

Affirmed.

PLEASANTS, C. J. I cannot agree with my associates in the conclusion that the judgment of the trial court in this case should be affirmed. I can find nothing in the contract pleaded in this case and established by the evidence which in any way distinguishes it, in so far as the liability of appellants is concerned, from the ordinary contract between the owner of property and an agent to pay a commission to the agent for making a sale of the property. The mere fact that both parties to the contract were land agents engaged in the business of buying and selling land on commission cannot affect the character of the liability incurred by appellants under the contract.

As a matter of fact the property, for the sale of which a commission amounting to 50 per cent. of the sale price of the property was awarded the appellee by the judgment in this case, was at the time of the sale owned by one of the appellants. But, as before said, this fact is not material.

A contract between agents for the sale by one of property held for sale by the other must be governed, in so far as the rights and liabilities of the parties are concerned, by the same rules of law applicable to such a contract between an agent and an owner.

Appellee's right to recover the commission claimed by him under the contract on which his suit was based depends upon whether as the result of his efforts appellants effected a sale of the property, or, in other words, whether he was the procuring cause of the sale. I think the evidence not only fails to show that he was the procuring cause of the sale, as that term has been uniformly defined in the decisions of our courts, but affirmatively shows that he had nothing to do with effecting the sale or procuring a purchaser other than the introduction to appellants of Mr. Hisgen, who he thought at the time of the introduction was a prospective purchaser of oil lands, but who, the undisputed evidence shows, was not at that time interested in such property and had no intention of becoming a buyer. There is no evidence that the property, for the sale of which appellee recovered commission amounting to more than $10,000, was offered to Hisgen by him, or that the appellee did or said anything which induced Hisgen to subsequently become interested in the property. These facts being undisputed, I know of no rule of law or equity which would entitle appellee to recover commissions on the sale of the property made several months thereafter by appellant, even if the sale had been made to Hisgen, which the undisputed evidence shows was not the case.

The undisputed evidence shows that the sale of the property for which appellee recovered commissions was not made to Hisgen, who, appellee claims, was the purchaser procured by him, but to a corporation in which Hisgen is not even shown to have been a stockholder. Some two months after appellee introduced Hisgen to appellants the appellant Glenn Nichols induced Hisgen to undertake the organization of a corporation to purchase the leases, and in pursuance of an agreement between them Hisgen purchased an option on the property, went to Massachusetts and induced parties there to form a corporation and take over the property. The option was transferred to the corporation, and the property was thereafter conveyed to it, and appellants gave Hisgen an interest in the royalty reserved by them in the land for making the deal.

I think the opinion of the majority, holding that upon the evidence in this case appellee is entitled to recover on the contract pleaded by him, is in direct conflict with the decisions in the cases of Brown v. Shelton (Tex. Civ. App.) 23 S. W. 483, and English v. Realty Co., 55 Tex. Civ. App. 137, 117 S. W. 996, and finds no support in any decision of any appellate court of this state.

Such being my conclusions upon the facts and law of the case, I respectfully dissent from the opinion of the majority of the court.